IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RICHARD B. BAYSON,<br><br>            Plaintiff,<br><br>vs.<br><br>SOUTHEAST COMMUNITY COLLEGE, et al.,<br><br>            Defendants. | 8:25-CV-575<br><br>MEMORANDUM AND ORDER |

      This matter is before the Court on several motions, the most pertinent one of which is the defendants' motion to dismiss for failure to state a claim (filing 30). The Court will grant that motion.

## STANDARD OF REVIEW

      A complaint must set forth a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). This standard does not require detailed factual allegations, but it demands more than an unadorned accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need not contain detailed factual allegations, but must provide more than labels and conclusions; and a formulaic recitation of the elements of a cause of action will not suffice. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). For the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, but is not bound to accept as true a legal conclusion couched as a factual allegation. *Id.*

      And to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must also contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Iqbal,* 556 U.S. at 678. A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief. *Id.* at 679.

Determining whether a complaint states a plausible claim for relief will require the reviewing court to draw on its judicial experience and common sense. *Id.* The facts alleged must raise a reasonable expectation that discovery will reveal evidence to substantiate the necessary elements of the plaintiff's claim. *See Twombly*, 550 U.S. at 545. The court must assume the truth of the plaintiff's factual allegations, and a well-pleaded complaint may proceed, even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely. *Id.* at 556.

When deciding a motion to dismiss under Rule 12(b)(6), the Court is normally limited to considering the facts alleged in the complaint. If the Court considers matters outside the pleadings, the motion to dismiss must be converted to one for summary judgment. Rule 12(d). However, the Court may consider exhibits attached to the complaint and materials that are necessarily embraced by the pleadings without converting the motion. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003).

Here, the Court has considered the materials—particularly emails and academic records—that the plaintiff attached to his pleadings. *See* filing 1 at 12-31; filing 7 at 11-12. But, to the extent that the plaintiff's brief might assert facts not alleged in the pleadings, *see, e.g.*, filing 36 at 1, the Court has not considered them, *see Nat'l Legal & Pol'y Ctr. v. Berkshire Hathaway Inc.*, 774 F. Supp. 3d 1105, 1116 (D. Neb. 2024) (citing *Glick v. W. Power Sports, Inc.*,

944 F.3d 714, 717 (8th Cir. 2019)) (disregarding additional facts presented in opposition to motion to dismiss that were not included in pleadings).

## BACKGROUND

The plaintiff, Richard B. Bayson, is a former student at Southeast Community College (SCC), in the Respiratory Care program in 2023 and the Practical Nursing (LPN) program in 2024-25. Filing 7 at 6; filing 1 at 4; *see also* filing 7 at 12. The defendants are SCC and several instructors at SCC in the Respiratory Care and LPN programs.[1]

The plaintiff began the respiratory care program at SCC in fall 2023. Filing 7 at 6. He failed classes in Respiratory Care Principles and Respiratory Care Procedures in fall 2023. Filing 7 at 11. He alleges that his instructors weren't properly certified to teach, and that SCC permitted "a grading practice referred to as 'fudge points'" in a way that raised other students' grades but lowered his. Filing 7 at 6-7. While the plaintiff complains generally that this practice was unfair and unjust, *see* filing 7 at 7, he also specifically alleges that "fudge points" were primarily used to benefit white students. As a result, he's suing SCC and Kristin Lewis, the instructor he alleges used "fudge points," along with program director Todd Klopfenstein and instructor Angela

---

[1] The plaintiff's initial complaint (filing 1) sued SCC and several nurses for events occurring in the LPN program in 2025. His first amended complaint (filing 7) left out those allegations and sued SCC and several respiratory care instructors for events occurring in the respiratory care program in 2023. His second amended complaint (filing 10) put all those defendants together, but for his statement of claim simply said "SEE ATTACHMENT" when there isn't an attachment. See filing 10 at 5. Accordingly, the Court has considered the plaintiff's amended complaints as supplemental to, rather than superseding, his original pleading, and read them together to determine what his allegations and claims are. *See* NECivR 15.1(b).

Poppenhagen for allegedly deferring to Lewis' grading decisions, resulting in the plaintiff's "emotional distress and career derailment." Filing 7 at 6-10.

In spring 2024 the plaintiff entered the LPN program. Filing 7 at 12. He completed most of his coursework successfully in the spring and summer sessions, but withdrew from Practical Nursing Lab I and Practical Nursing Clinical I in fall 2024. Filing 7 at 12. He retook both those classes in Spring 2025. Filing 7 at 12. As part of the lab course, the plaintiff failed on his first two attempts at demonstrating medication administration competency. Filing 1 at 13-15. His third attempt was scheduled for the afternoon of March 26, 2025. Filing 1 at 14.

At 2:14 a.m. on the morning of March 26, the plaintiff emailed Ashley Fritz, the nursing program chair, to express his dissatisfaction with the program and the instruction he was receiving. Filing 1 at 16-17. Generally summarized, the plaintiff complained about unfair treatment of people of color, and asserted that his second retake of the medication administration competency had been inaccurately assessed. Filing 1 at 16-17.

Later that day, the plaintiff failed his third and final attempt at demonstrating medication administration competency. Filing 1 at 19. He was informed that would result in failing grades in both his lab and clinical courses, and advised to withdraw from those courses to avoid the 'F's. Filing 1 at 18, 20.

In May, the plaintiff contacted SCC associate dean of student affairs Stephen Dietz to complain about the "unfair treatment" he said he had experienced at SCC. Filing 1 at 23. The plaintiff demanded, among other things, that he be placed into the Associate Degree Nursing (RN) program, that the 'W' grades he'd gotten by withdrawing from his lab and clinical courses be removed from his transcript, and that his tuition be refunded and his balance with the bursar's office be discharged. Filing 1 at 23-24. After discussing the

plaintiff with someone in the LPN program (presumably Fritz), Dietz refused those demands. Filing 1 at 23.

Dietz did offer to provide the plaintiff with a form he could use to file a grievance—essentially, a grade appeal. Filing 1 at 23. Dietz explained that the plaintiff would need to explain to a grievance committee how he had actually passed the medication administration competency. Filing 1 at 23. Dietz followed up by emphasizing that the "crux of the appeal" would be whether the plaintiff could prove that he "should have passed those administrations." Filing 1 at 25. Dietz advised the plaintiff that he would be unlikely to succeed in his appeal, given a video recording of the third failed attempt. Filing 1 at 25.

A few days later, Dietz informed the plaintiff that "[a]fter reviewing your grievance application and exploring possible outcomes, the resolutions you seek are unattainable." Filing 1 at 31. Specifically, Dietz said that the plaintiff's transcript couldn't be altered, and that admission to the RN program would require the plaintiff to go through the ordinary process like any other student. Filing 1 at 31. The plaintiff asked to be placed on the waitlist for the RN program, then again requested grade adjustment and tuition reimbursement because of "unqualified instructors." Filing 1 at 29-30. When the plaintiff asked about the outcome of his grievance, he was told that an official grievance committee had never met because the relief the plaintiff sought was unattainable, and he was advised to contact admissions regarding the RN program. Filing 1 at 27. Instead, he filed this lawsuit, naming SCC, Fritz, and three other instructors in the nursing program.[2]

---

[2] Some of the individual defendants are sued in both their official and individual capacities. Filing 1 at 2-3. Others, it's not specified. Filing 7 at 2; filing 10 at 2-3. Applying the "course of proceedings test," *see S.A.A. v. Geisler,* 127 F.4th 1133, 1139 (8th Cir. 2025), and seeing no

DISCUSSION

The plaintiff's pleadings suggest a number of claims for relief, some more developed than others. All told, he refers to:

- the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq.* (ADA),
- the Rehabilitation Act of 1973, 29 U.S.C. § 794,
- Title XI of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*,
- Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*,
- the Due Process Clause (via 42 U.S.C. § 1983),
- the Equal Protection Clause (via § 1983), and
- Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Filing 1 at 3; filing 7 at 3.

Other theories are asserted in the plaintiff's briefing. *See* filing 36. Although not clearly articulated, he refers to the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and common-law fraud and breach of contract theories. Filing 36 at 8-10, 14. But some claims are easily dispensed with from the start.

ADA AND REHABILITATION ACT

The ADA, to begin with, provides that "no qualified individual with a disability shall, by reason of such disability, . . . be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In other words, the ADA has three elements: (1) the plaintiff is a qualified individual with a disability, (2) a public entity denied him the benefits of its services or discriminated

---

distinction among the defendants, the Court concludes that the plaintiff intended to sue all the individual defendants in both their individual and official capacities.

against him, and (3) the denial or discrimination was by reason of his disability. *See Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir. 1999).

Nowhere in the plaintiff's pleadings does he allege that he has a disability, much less that SCC denied him services or discriminated against him on the basis of that disability. *See* filing 1; filing 7; filing 10. And the ADA and Rehabilitation Act are virtually identical, except that the ADA has no federal funding requirement. *Gorman v. Bartch,* 152 F.3d 907, 912 (8th Cir. 1998). As a result, "cases interpreting either are applicable and interchangeable." *Id.* (quoting *Allison v. Dep't of Corrs.,* 94 F.3d 494, 497 (8th Cir. 1996)).

The only mention of disability in the plaintiff's brief is his contention that "If SCC failed to provide equal access or retaliated against me in connection with disability rights; that is a violation of Section 504 and ADA Title II." Filing 36 at 14. Perhaps so, but nowhere in the plaintiff's pleadings does he allege that SCC's actions actually *were* in connection with a disability. The plaintiff's failure to connect SCC's treatment of him to any alleged disability is fatal to any claim under the ADA or Rehabilitation Act.

TITLE IX

The plaintiff's Title IX claim is similarly flawed. Title IX generally provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

A school may incur liability under Title IX, if it is (1) deliberately indifferent (2) to known acts of discrimination (3) that occur under its control. *Shrum ex rel. Kelly v. Kluck,* 249 F.3d 773, 782 (8th Cir. 2001). But the plaintiff

alleges no such acts of discrimination on the basis of sex. Accordingly, his Title IX claim will also be dismissed.

## POST-SECONDARY TEACHING PERMIT

Several of the plaintiff's claims, under different theories, rest on the same premise: That many if not all of the plaintiff's instructors weren't properly certified to teach. *See* filing 36 at 2-10. That premise is incorrect as a matter of law.

Under Nebraska law, "no person shall be employed to teach in any public, private, denominational, or parochial school in this state who does not hold a valid Nebraska certificate or permit issued by the Commissioner of Education legalizing him or her to teach the grade or subjects to which elected." Neb. Rev. Stat. § 79-802(1); *see also* Neb. Rev. Stat. § 79-808. But that requirement applies to prekindergarten, elementary, and high schools. *See* Neb. Rev. Stat. § 79-101. Chapter 79 of the Nebraska Revised Statutes applies to education from elementary through secondary school, while Chapter 85 applies to community colleges. *Apland v. Ne. Cmty. Coll.*, 599 N.W.2d 233, 238 (Neb. Ct. App. 1999). And Chapter 85 contains no requirement for state certification of community college instructors—instead, the board of the community college sanctions teaching contracts. Neb. Rev. Stat. § 85-1528.

The state Department of Education's regulations make the same distinction. *Compare* 92 Neb. Admin. Code Ch. 21, § 002.19 (defining "Nebraska school system" as including "grade level prekindergarten through grade twelve (12)"), *with* 92 Neb. Admin. Code Ch. 21, § 002.21 (defining "postsecondary educational entity"). The plaintiff points to 92 Neb. Admin. Code Ch. 21, § 005, which establishes a "Postsecondary Teaching Permit." Filing 36 at 19. But that doesn't mean what he thinks. A postsecondary teaching permit is for teachers to teach courses for college credit *that also*

*include high school students. See* 92 Neb. Admin. Code Ch. 21, § 005.20B. But a postsecondary teaching permit isn't required for teachers who already have regular teaching certificates, nor is it required for teachers who only teach college-aged students. Neb. Dep't of Ed., *Teaching Postsecondary Permit: FAQ*, https://perma.cc/AKC4-YUGM (last visited Dec. 12, 2025).

The plaintiff's misunderstanding of the relevant statutes and regulations is essential to several of his theories of recovery: his common law claims, his claims pursuant to the Higher Education Act, and his claims pursuant to the False Claims Act. Accordingly, they will be dismissed.

## DUE PROCESS CLAUSE

The plaintiff's due process claims are scattered. He asserts that he "was denied a fair grievance process, forced to withdraw from core nursing courses without a hearing, and suffered academic harm without procedural safeguards." Filing 1 at 3. He elaborated:

> After i [sic] emailed the Nursing Director on March 26, 2025 regarding fairness and retaliation in the LPN program, she briefly met with me once but showed little interest in hearing my concerns. A few days later she sent me an email stating that per the handbook, I would receive an F in lab/clinical unless i [sic] withdrew. No due process. She also stated that I would not be permitted to administer medications – effectively forcing me out of the program. I was given incoherent grievances responses by [SCC]. On one occasion, I was told/emailed by submission qualified as a formal grievance. Days later, the same submission was dismissed as "not a grievance." This contradictory handling

> obstructed my ability to seek redress and demonstrated a lack of procedural integrity.

Filing 1 at 4.

Fortunately, more direct evidence of these events is included in the record, and refutes some of the ways in which the plaintiff characterized them. The plaintiff wasn't "forced" to withdraw: He was informed of the consequences of failing the medication administration competency, and given the choice to withdraw to avoid those consequences. A difficult choice is still a choice.

But in any event, the full procedural safeguards of the fourteenth amendment are inapplicable if a student is dismissed from a state educational institution for failure to meet academic standards. *Schuler v. Univ. of Minn.*, 788 F.2d 510, 514 (8th Cir. 1986) (citing *Bd. of Curators v. Horowitz,* 435 U.S. 78 (1978)). Dismissal for academic reasons satisfies procedural due process if the student had prior notice of faculty dissatisfaction with his performance and of the possibility of dismissal, and if the decision to dismiss the student was careful and deliberate. *Id*.

The plaintiff was plainly aware: He had failed the competency twice before and told that he was facing his "3rd and final attempt." Filing 1 at 14. And the consequences of failing again were explained in the program handbook. *See* filing 1 at 20. Those circumstances are virtually identical to what the Eighth Circuit, in *Schuler*, held to satisfy due process. *See id*.

The plaintiff's description of the grievance process also mischaracterizes what he was told by SCC officials. He was offered the opportunity to appeal his grade on the medication administration competency, and was told about the scope of that proceeding. *See* filing 1 at 23-25. The grievance was rejected without a grievance committee meeting because the relief the plaintiff sought was outside the scope of a grade appeal. *See* filing 1 at 27. But even if SCC had

failed to follow its own grievance procedures, it would not have violated the plaintiff's right to due process, because the consideration he received from his instructors and the program director exceeded the process constitutionally required to protect his interest in continuing the LPN program. *See id.*

The plaintiff's due process allegations are without merit.

### EQUAL PROTECTION/TITLE VI

Title VI prohibits discrimination on the basis of race by any program that is a recipient of federal funds. *See* 42 U.S.C. § 2000d. The plaintiff's Title VI claim is coextensive with his Equal Protection claim. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 198 n.2 (2023) (citing *Gratz v. Bollinger*, 539 U.S. 244 (2003)).[3]

To prove such a claim, the plaintiff must show a forbidden reason was "the but-for cause of a denial of benefits." *Abdull v. Lovaas Inst. for Early Intervention Midwest*, 819 F.3d 430, 433 (8th Cir. 2016). Only allegations of intentional discrimination suffice. *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010). And to prove SCC's discriminatory intent, the plaintiff must establish that he was treated differently from others similarly situated. *Does 1-2 v. Regents of the Univ. of Minn.*, 999 F.3d 571, 580 (8th Cir. 2021). Alleged comparators must be "similarly situated in all relevant aspects." *Id.*

---

[3] With this exception: Title VI claims can't be brought against individual defendants in their individual capacities. *See Steel v. Alma Pub. Sch. Dist.*, 162 F. Supp. 2d 1083, 1085 (W.D. Ark. 2001) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998)). But having concluded that the plaintiff failed to state a claim against anyone, the Court doesn't need to address the distinction.

The plaintiff alleges racial discrimination in two separate aspects of SCC's programs: the LPN program and the respiratory care program. But to start with, the plaintiff's filings conclusively establish why he left the LPN program: He withdrew from his lab and clinical courses to avoid failing them. The filings also conclusively establish why he was in that situation: He failed his medication administration competency three times. So, as far as the LPN program is concerned, only one potential comparator is relevant: Someone who similarly failed their medication administration competency, but was passed or permitted to remain in the LPN program. The plaintiff doesn't allege the existence of such a comparator. *See Richmond v. Fowlkes*, 228 F.3d 854, 860 (8th Cir. 2000) (finding that pharmacy student had "not shown that other students who were similarly situated received different treatment," because he had received more negative evaluations than any other students).

The closest the plaintiff comes to alleging discrimination in the LPN program isn't even in his pleading—it's in his pre-dismissal letter to the program director, where he asserted that during the previous semester, "several students, primarily Caucasian students, were given four chances to pass their math calculations, even though the manual clearly states that only three attempts are allowed before repeating the program." Filing 1 at 16. Meanwhile, he said, "[s]ome students have been allowed to move forward after making critical mistakes, while others, particularly students of color, are repeatedly failed and phased out of the program." Filing 1 at 16.

But even that falls short of claiming that white students and students of color had been treated differently for making the same mistakes. And none of it, even if proven, would be enough to show that race discrimination was the but-for cause of the plaintiff's exit from the LPN program. *Cf. LaBlanche v. Univ. of Iowa, Coll. of Med.*, 1 F. App'x 574, 575 (8th Cir. 2001).

The plaintiff's allegations with respect to the respiratory care program are more concrete, but still fall short. He says that on the "critical skill" of "ABG interpretation,"[4] his instructor

> employed a grading system that consistently demonstrated manipulation and unequal treatment of students. Despite widespread confusion among students regarding ABG interpretation, [the instructor] assigned disproportionately favorable grades to select individuals who demonstrated poor understanding of the material. . . . This patten [sic] of grading manipulation occurred across multiple assignments and tests, creating a consistent disparity that undermined the integrity of the evaluation process. The Plaintiff and other students were equally lost and confused during the stages of ABG instruction, yet [the instructor's] grading decisions did not reflect objective performance or uniform standards.

Filing 7 at 7. The plaintiff also alleges that the instructor

> used a grading practice referred to as 'fudge points" to increase midterm and final grades for students with similar or lower averages. These adjustments were applied inconsistently. While other students received enough fudge points to raise their final

---

[4] Probably Arterial Blood Gas. *See* David A. Kaufman, Am. Thoracic Soc'y, *Interpretation of Arterial Blood Gases (ABGs)*, https://www.thoracic.org/professionals/clinical-resources/critical-care/clinical-education/abgs.php (last checked Dec. 21, 2025).

> grades to passing levels, the plaintiff's midterm exam score was lowered, resulting in a failing grade of a D.

Filing 7 at 7.

But the only allegation that carries this toward race discrimination is the conclusory assertion that "[s]tudents with similar averages were given substantial midterm exam boost through undocumented 'fudge points', primarily benefiting white students." Filing 7 at 6.

The Eighth Circuit's decision in *Does 1-2* is instructive. In that case, the plaintiffs alleged that they were unfairly disciplined as a result of their race. 999 F.3d at 574. The Court of Appeals explained that in such a case, the plaintiffs "must plausibly plead that the acts of others who were not disciplined or were disciplined less severely were of comparable seriousness to their infraction." *Id.* at 580. But they failed to do so—instead, their complaint only "allege[d] in conclusory fashion that the University 'treated Plaintiffs less favorably in the investigation and discipline than the University had treated persons of a different race under similar circumstances.'" *Id.* Their complaint was insufficient because they hadn't "plausibly allege[d] a comparator 'similarly situated to Plaintiffs in all relevant aspects.'" *Id.* at 581. Their claims were properly dismissed because they "failed to allege -- beyond legal conclusions couched as factual statements -- that they were treated less favorably because of their race." *Id.*

The plaintiff's allegations here are similarly conclusory. While the plaintiff describes in some detail how the grading system allegedly benefited students who actually had a less firm grasp on the course material, the allegation of *race* discrimination is simply that the scheme "primarily benefit[ed] white students." Filing 7 at 6. And—particularly because Title VI has no private right of action to enforce disparate-impact regulations, *see*

*Alexander*, 532 U.S. 275—that allegation is at best a legal conclusion of racial discrimination, not a plausible allegation of a similarly situated comparator.

Indeed, the Court notes, in his briefing the plaintiff appears to have abandoned his race discrimination theories altogether. *See* filing 36 at 3, *see also Sabri v. Whittier All.*, 122 F. Supp. 3d 829, 835 (D. Minn. 2015), *aff'd*, 833 F.3d 995 (8th Cir. 2016) (treating theories not defended in opposing a motion to dismiss as having been abandoned). Instead, he attempts to ground his equal protection and Title VI claims on alleged discrimination in favor of "other students with lower academic averages or no medical experience." Filing 36 at 3. But again, his generalized assertions of unfairness fail to identify a relevant comparator, particularly one who repeatedly failed medication administration competency. And the Court declines the plaintiff's apparent invitation to hold that federal civil rights law requires federal courts to review community college grading and ensure its accuracy—at least, in the absence of any plausibly supported allegation of improper racial bias or personal animus. *See Hurd v. Hansen*, 230 F. App'x 692, 693 (9th Cir. 2007).

The plaintiff has failed to sufficiently plead a race-based discrimination claim, and has abandoned his race-based theory in his briefing. His theory that Title IV or the Equal Protection Clause are violated by unfair grading is legally without merit and factually unsupported by his pleadings. Accordingly, the plaintiff's Title VI and equal protection claims will be dismissed for failure to state a claim.

### RETALIATION CLAIMS

The plaintiff also suggests, rather vaguely, that he was retaliated against for his March 26, 2025, letter to Fritz complaining about the LPN program. Filing 1 at 3. Assuming that the basis for that claim is his assertion in that letter that students of color were being treated unfairly, it might be

protected activity that would support a retaliation claim under Title VI. *See Libault v. Mamo*, No. 4:22-CV-3096, 2023 WL 3011259, at \*10 (D. Neb. Mar. 20, 2023), *aff'd,* No. 23-1802, 2023 WL 6532621 (8th Cir. Oct. 6, 2023).

But such a claim would still require a plausible allegation that SCC took adverse action against the plaintiff because of his participation in the protected activity. *See Does 1-2*, 999 F.3d at 579-80. As explained above, the basis for SCC's "action" against the plaintiff is clear, and retaliation was not a but-for cause. *See Blomker v. Jewell*, 831 F.3d 1051, 1059 (8th Cir. 2016) (plaintiff failed to state a retaliation claim because a letter was attached to her complaint setting out the non-discriminatory and non-retaliatory reasons for her termination). Moreover, there's no allegation that the decisionmaker who set that chain of events in motion—the instructor who failed the plaintiff on his medication administration competency—even knew about the letter. *See Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 983 (8th Cir. 2022) (retaliation claim failed when there was no evidence decisionmaker knew of alleged protected activity).

There is, in other words, no plausible allegation establishing that the plaintiff was retaliated against for complaining to Fritz.

## CONCLUSION

The Court is aware that one of the defendants, Diane Anderson, has yet to be served with process or appear in this case. *See* filing 37; filing 39. But courts frequently extend the rationale utilized to dismiss served defendants to unserved defendants where, as here, the reasons for dismissal are applicable to the unserved parties. *Smith v. Barnett*, No. 4:20-CV-4066, 2020 WL 6205760, at \*7 (D.S.D. Oct. 22, 2020) (collecting cases); *see also Jackson v. Focus Features LLC*, No. 4:24-CV-1194, 2025 WL 1706717, at \*3 (E.D. Mo. June 18, 2025). The plaintiff's claims against Anderson are integrally related

to his other claims and she is in substantially the same position as other defendants against whom the plaintiff's claims have been dismissed. *See Jackson*, 2025 WL 1706717, at *3 (citing *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981)).

For the foregoing reasons, the defendants' motion to dismiss will be granted and the plaintiff's claims dismissed. The plaintiff's pending motions for preliminary injunction will be dismissed as moot. The plaintiff also filed (another) unauthorized sur-reply brief. Filing 45. That filing will be stricken as unauthorized by this Court's rules. *See* NECivR 7.1(b)(1) and (c)(3).

IT IS ORDERED:

1. The plaintiff's sur-reply brief (filing 45) is stricken.

2. The defendants' motion to dismiss (filing 30) is granted.

3. The plaintiff's claims are dismissed.

4. The plaintiff's motions for preliminary injunction (filing 14; filing 44) are denied as moot.

5. A separate judgment will be entered.

Dated this 22nd day of December, 2025.

BY THE COURT:

_John M. Gerrard_
John M. Gerrard
Senior United States District Judge